## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No: 22-CR-199-CJN** |
| v. | : | |
| | : | |
| **THOMAS SMITH,** | : | |
| | : | |
| Defendant. | : | |

### <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

The United States of America respectfully submits its Sentencing Memorandum in the above-captioned matter. Defendant Thomas Smith is a former federal law enforcement officer who pleaded guilty to violating his duty, and the Constitution, by willfully acting with deliberate indifference to a substantial risk of serious harm and then taking steps to cover up his misconduct. He committed this offense by driving his police cruiser in a reckless and dangerous manner, causing a crash that easily could have turned fatal. As evidenced by a subsequent conviction in Maryland for shooting his neighbor's dog, Smith's rash conduct at issue in this case is not an aberration. To adequately address the gravity of his federal offense and further the goals of the criminal justice system, the government recommends that the Court sentence Smith to 27 months of incarceration, to run consecutively to the sentence he is currently serving for his entirely distinct yet similarly reckless crime in Maryland.

## I.  <u>THE DEFENDANT'S CRIMNAL CONDUCT</u>[1]

*A. The June 20, 2020, Hit-and-Run in Georgetown*

On June 20, 2020, at approximately 11:45 p.m., Metropolitan Police Department (MPD) officers and Emergency Medical Services (EMS) were dispatched to the intersection of Wisconsin Avenue and M Street NW in Georgetown, after they received 9-1-1 calls about a vehicle crash that involved a motorcycle and a police cruiser that fled from the scene.

Upon arrival, MPD officers found the then 21-year-old victim, W.W., unconscious on the street being aided by bystanders.  MPD immediately began an investigation and quickly learned that the collision involved a United States Capitol Police (USCP) cruiser.  Federal investigators were alerted and initiated a federal investigation into the crash.

Federal investigators determined that the involved USCP cruiser that struck the victim was driven by Smith, who was working and on duty at the time of the crash.  Smith was purportedly conducting dignitary checks on members of Congress in the Georgetown area at the time of the incident.

As part of the investigation, the government obtained video footage from Georgetown CCTV street cameras.  The footage showed Smith's police cruiser pursuing the victim southbound along Wisconsin Avenue NW as they approached the M Street NW intersection where the collision occurred.  Although the intersection's rotating traffic camera did not record the moment of impact, it showed Smith's cruiser speeding away from the scene immediately following the crash, and the prone victim lying unconscious in the intersection a short distance from his motorcycle.

---

[1] As part of Smith's guilty plea, he agreed to and submitted a factual basis for his conviction on Count One. (*See* ECF No. 33).  The Plea Agreement allows the parties to provide this Court with a fulsome picture of Smith's conduct, including any misconduct not described in the charges to which he pleaded guilty or the factual basis.  (*See* ECF No. 32, at 4).  Accordingly, the government submits the following summary of Smith's relevant conduct to aid the Court in sentencing.

According to USCP policies and procedures, Smith was not permitted to engage in any vehicular pursuits until and unless he notified his superiors and MPD of the chase and obtained permission to engage.  Smith was further required to stop and render aid to the victim, summon EMS, and notify his superiors of the crash.  Smith did not follow any of these rules.

B.  *Eyewitness Accounts*

Five eyewitnesses saw the incident.  They all described Smith's driving as reckless.  One witness was an MPD sergeant who observed Smith chasing the victim moments before the crash, and four others were civilian bystanders who were at the intersection and observed the collision.

The MPD sergeant, who responded to the scene of the crash, reported that he nearly collided with Smith's cruiser as they passed one another while driving in opposite directions minutes earlier.  The sergeant was the Georgetown shift supervisor and patrolling the area at that time.  As the sergeant was driving northbound along Wisconsin Avenue NW, he observed two motorcycles pass him traveling southbound.  Seconds later, he saw Smith's police cruiser following the motorcycles at a high rate of speed but without any emergency lights or sirens activated.  Before passing the sergeant, Smith's cruiser crossed into the sergeant's opposite lane of traffic, causing the sergeant to pull over and come to a complete stop to avoid a head-on collision.  Smith pulled back into the southbound lane and sped past the sergeant.  The sergeant did not receive any information from dispatch regarding a police pursuit, or that any other law enforcement agency was conducting an investigation in the vicinity.  Shortly after Smith's cruiser sped past, the sergeant received a radio call of a crash at the Wisconsin Avenue and M Street NW intersection.  The sergeant immediately suspected that the crash involved the vehicles that had just passed him.  This suspicion was confirmed when the sergeant responded to the scene.

Four eyewitnesses who were at the Wisconsin Avenue and M Street NW intersection observed Smith crash his police cruiser into the victim and flee from the scene.  They all reported that the police vehicle was being driven in a reckless manner.

One eyewitness, a tennis-pro, who was seated in his parked vehicle near the intersection, saw Smith accelerate and swerve his police cruiser into the victim as they approached the intersection.  He saw the victim fly off his motorcycle, flip through the air, hit the ground, and roll forward into the middle of the intersection.  Smith's cruiser then drove around the victim's body and sped away from the scene.  The tennis-pro saw the victim lying in the intersection suffering from an apparent seizure.  He immediately called 9-1-1 and remained at the scene.

Three other eyewitnesses, who were seated together in a vehicle stopped at the intersection on Wisconsin Avenue NW facing northbound, also saw and heard the collision.  The three witnesses were having a conversation when they heard a loud bang and immediately looked up.  They saw Smith's police cruiser with significant front-end driver's side damage speed past them in the opposite direction.  Once the cruiser sped past them, the eyewitnesses saw the victim lying in the middle of the intersection.  The witnesses also called 9-1-1 and remained at the scene to render aid.

*C.  The Damage*

The eyewitness accounts regarding the ferocity of the crash are corroborated by the resulting physical damage to Smith's cruiser and the victim's motorcycle.  Taken together, the eyewitness accounts suggest that the front driver's side of Smith's cruiser hit the victim's motorcycle.  Pictures taken of the cruiser within hours of the crash show extensive damage to the vehicle:



As shown in the above picture, the cruiser struck W.W. and his motorcycle with enough force and created enough friction with the objects it hit to destroy and rip off multiple parts of the cruiser. The areas around the parts that were ripped off the cruiser are littered with black skid marks.

Unsurprisingly, W.W.'s motorcycle also sustained significant damage. Following the incident, a private towing company took the motorcycle to a private tow lot. Investigators went to the tow lot and took pictures of the motorcycle in the days following the crash. They found that the entire seat and multiple parts of the bike were destroyed. The back tire was also dislodged from its proper mount on the axel:



Fortunately—and perhaps astoundingly given the damage to the vehicles involved—W.W.'s injuries did not lead to long-term hospitalization. But it would be a mistake to dismiss his injuries as trivial.[2] W.W. suffered lacerations on his face, head, arms, and knees. Given the force with which he hit the pavement after the crash, and the skidding that followed, his road-rash was significant. Pictures taken of him the next day showed many of his wounds still bandaged. But the road-rash-caused-loss-of-skin is painfully evident from pictures taken of the area behind his left hear, which was not bandaged at the time:

---

[2] Contrary to defense counsel's public assertions that W.W. "suffered only minor scrapes and bruises," the injuries were much more significant. Moreover, there is no evidence to support defense counsel's public claims that W.W. was intoxicated at the time of the crash. *See* Spencer Hu, "Officer admits to covering up crash after unauthorized chase," WASH. POST, Oct. 19, 2023, *available at* https://www.washingtonpost.com/dc-md-va/2023/10/19/capitol-police-georgetown-bike-crash-guilty-civil-rights/.

 

### D.  The Cover-Up

In the immediate aftermath of the crash, Smith attempted to hide his conduct by failing to report the collision to USCP or MPD, switching out his clearly damaged police cruiser for another USCP fleet vehicle, falsifying USCP forms, and lying to his shift supervisor.

Smith began his shift on June 20, 2020, at approximately 6:00 p.m. that evening, and was assigned to drive a USCP sedan, specifically car number 1534.  This assignment was unique because it was an older fleet vehicle that was put into service due to a shortage of available vehicles and was the only sedan that was assigned to officers on Smith's shift.  The fleet sergeant, shift supervisor, and Smith's shift partners all remembered this specific vehicle being assigned to Smith that evening.  Moreover, the fleet sergeant specifically remembered that there was no damage to the sedan, and that no other USCP officer had driven that vehicle before it was assigned to Smith.

USCP protocol required officers to make an entry in a logbook at the beginning of each shift showing their vehicle assignment.  Smith failed to do this at the beginning of his shift after being assigned car number 1534.  Shift officers are further required to complete a vehicle inspection report, or CP-400, upon receiving a vehicle assignment for patrol.  The CP-400

documents any noticeable damage or maintenance issues with the vehicle, as well as the vehicle's mileage.  Smith failed to complete a CP-400 for his assigned sedan.

Following the collision in Georgetown, Smith logged a false entry into the computer assisted dispatch (CAD) system.  Smith entered a CAD event as "appears secure," indicating that he had performed a routine dignitary check in Georgetown.  Smith then drove his damaged cruiser back to his USCP station and switched vehicles.

Security footage from the USCP station showed that Smith returned the damaged car (number 1534) to the station a short time after the crash.  The footage showed Smith emerging from the vehicle, entering the station, and returning to the parking lot minutes later.  Smith then got in a USCP SUV and resumed patrol.

The investigation revealed that while inside the USCP station, Smith made a false logbook entry that indicated he was assigned the USCP SUV for his shift that evening.  He also left the keys to the damaged sedan he was in fact assigned on the fleet sergeant's desk.  Smith further created a falsified CP-400 for the USCP SUV, which suggested that it was his assigned vehicle during that shift.  Smith then misstated the SUV's mileage to give the appearance that Smith drove the SUV more miles than he actually did.

Following Smith's hit-and-run in Georgetown, his shift sergeant was notified by the watch commander that MPD was investigating a Georgetown vehicle crash involving a motorcycle and a USCP sedan that sustained significant front-end damage because of the collision.  The USCP sergeant contacted Smith and other patrol officers working during that shift to determine whether any of them were involved in the crash, were driving a USCP sedan, or had knowledge of the incident.  The shift sergeant specifically asked Smith which USCP vehicle he was driving.  Smith stated that he had been driving a USCP SUV all evening, and not a sedan.  Smith further stated

that he was not aware of or involved in any collision or crash involving a motorcycle or MPD. Following his call with Smith, the shift sergeant discovered the damaged USCP sedan (car number 1534) that Smith was assigned in the police parking lot, and reviewed footage that showed Smith switching the vehicles following the incident in Georgetown.

After USCP determined that Smith was involved in the Georgetown crash, failed to report it, and attempted to cover-up his misconduct, Smith was summoned back to the USCP station from his patrol and relieved from duty.

### E. Evidence of Intoxication

Shortly after Smith was summoned back to the USCP station, MPD was contacted to complete their local crash investigation, as the federal investigation into Smith's misconduct continued.  Federal investigators photographed and inspected Smith's damaged USCP sedan and discovered an unopened beer bottle on the vehicle floor behind the front passenger seat.  MPD obtained a urine sample from Smith to determine whether he was intoxicated or under the influence of any narcotics at the time of the crash.  Although the urine sample was collected approximately seven hours after the collision, lab results showed that it tested positive for the presence of alcohol.

### F. The Maryland Offense

As described above, the offense conduct in the federal case occurred in June 2020 in the District of Columbia.  A year later, in October 2021, in Maryland, Smith shot his neighbor's 1-year-old German Shepard (named "Peanut").  According to the Statement of Probable Cause filed in Carroll County against Smith, Peanut suffered an entrance and exit gunshot wound, with the bullet going through the thorax and passing through skin, muscle, and in between two ribs. According to the same document, local law enforcement spoke to Smith when they were called to the scene after the shooting and "[Smith] was not forthcoming with information."  This included

Smith stating that he "was home all day but did not hear any gunshots in the neighborhood." The shooting was recorded by home security video cameras.

Smith testified in his defense at the state-court bench trial in Maryland and denied that he shot the dog or that he was the person depicted in security footage of the incident. As reflected in the guilty verdict rendered, the presiding judge did not credit Smith's testimony or accept his defense.

## II.      RELEVANT PROCEDURAL BACKGROUND

On June 2, 2022, a District of Columbia federal grand jury investigating Smith's conduct related to the Georgetown hit-and-run charged him with committing multiple civil rights and obstruction of justice offenses. (*See* ECF No. 1). Specifically, the indictment charged Smith with two counts of deprivation of rights under color of law, in violation of 18 U.S.C. § 242; one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3); three counts of falsification of records, in violation of 18 U.S.C. § 1519; and one count of making false statements, in violation of 18 U.S.C. § 1001(a)(2). *Id.*

On October 18, 2023, Smith entered a plea of guilty to Count One, which charged him with a felony civil rights violation of Section 242. (*See* ECF No. 32, and minute entry dated October 18, 2023). Specifically, Smith admitted to willfully placing the victim (W.W.) at a substantial risk of serious harm by driving his police cruiser in a reckless and dangerous manner and acting with deliberate indifference to the risk he created. (*See* ECF No. 33 at 12). The Plea Agreement indicated the government would request that this Court dismiss the remaining counts at Smith's sentencing hearing. (*See* ECF No. 32 at 2).

When Smith entered his guilty plea in this case, the prosecution was unaware that he was facing charges in the Circuit Court for Carroll County, Maryland for shooting his neighbor's dog.

On October 20, 2023—two days after entering his guilty plea in federal court—a previously continued bench trial in the Maryland case resulted in Smith's conviction on malicious destruction of property and animal cruelty charges.  Smith was sentenced on these state convictions on December 15, 2023, at which time he was remanded to the custody of the Carroll County Sheriff's Office to begin serving an 18-month period of incarceration.[3]

Because of Smith's incarceration in Maryland, the government requested, and the Court issued, a writ of habeas corpus *ad prosequendum/testificandum* to secure Smith's presence at his federal sentencing, which is scheduled for January 22, 2024.  The government did not, and has not, placed a detainer on Smith in Maryland.

### III.   GUIDELINE ANALYSIS

As reflected in the parties Plea Agreement and the Probation Department's Presentence Report (PSR), the advisory guideline range for this offense is as follows:

| | | |
|---|---|---|
| U.S.S.G. §2H1.1(a) | Base Offense Level | 10 |
| U.S.S.G. §2H1.1(b) | Specific Offense Characteristics<br>→ Offense Committed Under Color of Law | +6 |
| U.S.S.G. §3C1.1 | Obstructing or Impeding the Administration Of Justice | +2 |
| U.S.S.G.§3E1.1 | Acceptance of Responsibility | -3 |
| | **Total** | **15** |

When the government entered its agreement with Smith, it was unaware of his pending Maryland charges.  As noted above, he was convicted on those state charges just days after entering

---

[3] On the malicious destruction of property conviction, Smith was sentenced to three years imprisonment, with all but 18 months suspended.  On the animal cruelty conviction, he was sentenced to 90 days, to be served concurrent to the sentence on the destruction of property count.  For the Court's convenience, a copy of the Carroll County Commitment Record is attached as Exhibit A.

his plea before this Court.  The Plea Agreement therefore identifies Smith as being a Criminal History Category I.  A Total Offense Level of 15 at that criminal history leads to a sentencing guideline range of 18-24 months.

As noted in the updated PSR, Smith's conviction and incarceration in Maryland gives him three criminal history points and changes his criminal history to Criminal History Category II.  *See* ECF No. 40 at ¶ 42.  A Total Offense Level of 15 at that criminal history leads to a sentencing guideline range of 21-27 months.

## IV.   <u>SENTENCING FRAMEWORK</u>

After *Booker v. United States*, 543 U.S. 220 (2005), district courts are to engage in a three-step sentencing procedure.  Courts are first to determine the applicable guidelines range, then consider whether a departure from that range is appropriate, and finally, consider the applicable guidelines range—along with all of the factors listed in 18 U.S.C. § 3553(a)—to determine what sentence to impose.  *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *Rita v. United States*, 551 U.S. 338, 351 (2007).  The central command to district courts in imposing a sentence is to fashion one that is sufficient, but not greater than necessary, to meet the goals set forth in 18 U.S.C. § 3553(a).

Section 3553(a) further delineates seven factors the Court must consider in fashioning an appropriate sentence: (1) the nature and circumstances of the offense/history and characteristics of the defendant; (2) the statutory purposes of sentencing, which includes principles of deterrence and promoting respect for the rule of law; (3) the kinds of sentences available; (4) the kinds of sentences and sentencing ranges as set forth in the Sentencing Guidelines; (5) Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.

### V.     A SENTENCE OF 27-MONTHS IS CALLED FOR IN THIS CASE

Following the advisory guideline analysis and consideration of the factors set forth in 18 U.S.C. § 3553(a), the government recommends this Court impose a sentence of 27-months incarceration.

As noted above, Section 3553(a) identifies seven factors this Court is to consider during sentencing.  While all of the factors are important for the Court's consideration in fashioning an appropriate sentence, the following factors tilt the scale considerably in favor of a high-end guidelines prison sentence.

### A.  The nature and circumstances of the offense, and the history and characteristics of the defendant, warrant a period of incarceration.

The first factor this Court should consider is the nature and circumstances of the offense. Smith abused a position of trust and authority when he, as a federal law enforcement officer, acted with deliberate indifference to a substantial risk of serious harm by driving his police cruiser recklessly and in a dangerous manner, and crashing into the victim resulting in bodily injury. Smith then fled from the scene of the crash without taking any reasonable steps to render aid or assist the injured victim as he lay unconscious in the middle of a busy intersection.  Smith further compounded his misconduct and engaged in false and misleading conduct in order to cover up the crash.  Smith failed to report the crash, switched vehicles, falsified official USCP records, and lied to his immediate supervisor in an effort to undermine any investigation into the crash.  The nature and circumstances of the offenses merit a sentence of 27 months incarceration, at the top of the applicable sentencing guidelines.

Though Smith's personal history of reckless and wanton violence appears to be influenced

by his history of alcohol abuse,[4] his unhinged shooting of a neighbor's pet further clarifies that his reckless conduct at issue in this matter is not an isolated incident, and that his individual history and personal characteristics warrant a guideline prison sentence.

> B. *A 27-month sentence would reflect the seriousness of the offense and promote respect for the law.*

A 27-month sentence is appropriate in this case because Smith's willful violation of the Constitution inflicted serious injuries on the victim.  Smith abused his position of trust as a federal police officer by knowingly engaging in reckless conduct, which is a crime that victimized an otherwise defenseless motorcyclist, and by attempting to cover-up this crime.  The Sentencing Guidelines make it clear that an officer who violates the law should expect a greater punishment than a civilian who engages in the same misconduct.  *See, e.g.*, *United States v. Webb*, 214 F.3d 962, 965 (8th Cir. 2000) (holding that the enhancement under U.S.S.G. § 2H1.1(b) is "justified on the wholly independent ground that [the defendant] was a 'public official' at the time of the offense") (citing *United States v. Livoti*, 196 F.3d 322, 327 (2d Cir. 1999)); *see also United States v. Hickman*, 766 F.App'x 240, 251 (6th Cir. 2019) (same).  The government therefore submits that a period of incarceration would provide a just punishment for Smith.

A 27-month sentence would also promote respect for the law.  Smith faced a clear choice: to knowingly engage in criminally reckless and dangerous conduct or comply with the laws of the United States.  Smith chose the former and crashed his police cruiser into a hapless motorist resulting in a potentially fatal collision.  Smith then faced another clear choice: he could stop, render aid to the injured victim, and notify both the paramedics and his fellow law enforcement officers of the crash.  But Smith—not knowing whether the incident had been fatal to the motorist

---

[4] *See, e.g.*, ECF No. 40, at ¶ 61 (Noting that in 2012, Smith underwent outpatient surgery to place pins and screws in his hands because he "was intoxicated in Atlantic City, New Jersey, and became angry with his wife and punched a door, fracturing both of his hands.").

or not—chose to drive off and leave W.W. to fend for himself. Smith then faced yet another choice: he could admit his wrongdoing and tell his supervisors what happened. Smith chose to cover-up his crime by engaging in obstructive conduct that included falsifying records, switching vehicles, and lying to his superior officer.

In the months that followed the incident with W.W., Smith had been relieved of duty and his police powers, and he faced another clear choice: he could stop engaging in recklessly violent conduct and start adhering to the law. He chose to continue his reckless behavior when he grabbed one of his firearms and shot his neighbor's dog for no justifiable reason.

All of Smith's choices point to the obvious need for a guideline sentence that will promote respect for the law.

C. *A prison sentence would deter criminal conduct.*

A period of incarceration for Smith would deter criminal conduct by other law enforcement officers. Holding Smith accountable here will deter other officers from abusing their authority by endangering the public and dissuade them from covering up criminal conduct when it does occur. Without imposition of a guidelines sentence here, other law enforcement officers will not be discouraged from engaging in misconduct and may believe that there are relatively minimal consequences for flagrantly abusing a position of public trust and authority and then obstructing justice by trying to hide their illegality.

D. *A period of incarceration would avoid unwanted sentence disparities among similarly situated defendants.*

The government recognizes that any period of incarceration must take into account the need to avoid unwanted sentence disparities among defendants who have been found guilty of similar conduct. Smith is similarly situated to other law enforcement officers who have been charged with deprivation of rights under color of law and obstruction offenses for covering-up

misconduct.  Accordingly, Smith should be sentenced to a period of incarceration consistent with the advisory guidelines range.

The government strongly opposes any request for a variance from guidelines.  Smith's conduct resulting in the crash, his callous disregard for the injured victim who lay in the roadway as Smith fled from the scene, and Smith's cover-up warrants a 27-month term of incarceration.  If Smith is not sentenced accordingly, it will undermine the government's efforts to deter the criminal conduct at issue here, and in other official misconduct cases the government prosecutes throughout the United States.

E.   *The need to provide restitution to the victim.*

The Mandatory Victims Restitution Act (MVRA) provides that "the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1).  Beyond the bodily injury the victim sustained, he also suffered pecuniary damages.  The victim's motorcycle that he was riding home from work at the time of the crash sustained significant damage and was never recovered.  Following the crash, the victim's bike was towed and maintained at a local towing and recovery lot.  Although investigators photographed the bike following the collision, the FBI never took possession of the bike, and the tow yard eventually disposed of it.

The MVRA provides guidance in determining an appropriate restitution order in situations where return of the property is impossible or impracticable.  18 U.S.C. § 3663A(b)(1)(B)(i)(II).  The statute requires the defendant to pay an amount equal to the value of the property on the date of sentencing less the value of any part of the property that is returned.  *Id*.  The victim reports, as depicted in the post-collision photographs of the cycle, that it was enhanced with several after-market modifications.  Although the victim has been unable to locate the receipts for his

motorcycle (a 2017 Honda Grom) and modifications, he has provided the Government with replacement values.   The victim submitted a current valuation for his losses, which is approximately $4455, not including the labor costs for the after-market modifications.   That valuation is attached to this memorandum.   (*See* Exhibit B).   This valuation is consistent with the current market value for the victim's motorcycle without the modifications, which redeems at approximately $3300.[5]

Accordingly, the Government requests that this Court include in Smith's sentencing, an order for restitution in the amount of $4455.

### VI.    THE FEDERAL SENTENCE SHOULD RUN CONSECUTIVE TO AND BE SERVED AFTER THE DEFENDANT'S STATE SENTENCE

*A.   The Court can and should order that the federal sentence run consecutive to the state sentence.*

The Court should order that a federal sentence in this case run consecutive to and be served after Smith's current sentence in Maryland.   This decision is up to the Court's discretion, but the factors guiding the use of that discretion clearly support the imposition of consecutive sentences.

As the Supreme Court and D.C. Circuit have noted, "Judges have long been understood to have discretion to select whether the sentences they impose will run concurrently or consecutively with respect to other sentences . . . that have been imposed in other proceedings, including state proceedings." *Setser v. United States*, 566 U.S. 231, 236 (2012) (citing *Oregon v. Ice*, 555 U.S. 160, 168-69 (2009)); *United States v. Ayers*, 795 F.3d 168, 172 (D.C.Cir. 2015) (citing *Setser*).

Statutory support for this maxim is found in 18 U.S.C. § 3584.[6]   The statute provides that

---

[5]   *See*   https://www.kbb.com/motorcycles/honda/grom/2017/?pricetype=retail&vehicleclass=motorcycles (Kelly Blue Book "typical listing price" value for a 2017 Honda Grom).

[6]   The Sentencing Guidelines also make clear that when "an undischarged term of imprisonment" for

"if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively." 18 U.S.C. § 3584(a).[7]

Both § 3584 and D.C. Circuit caselaw direct the sentencing court to root its decision whether to run a sentence consecutive or concurrent to an unfulfilled state sentence in the § 3553(a) factors. *See* 18 U.S.C. § 3584(b); *Ayers*, 785 F.3d at 172; *Williams*, 158 F. Supp. 3d at 3. Beyond the general expression, "separate crime, separate time," and in keeping with the § 3553(a) factors, a sentencing court must base its assessment on case-specific circumstances and factors relevant to the individual defendant being sentenced. *See United States v. Miller*, 799 F.3d 1097, 1107 (D.C. Cir. 2015).

Smith's conduct, his individual circumstances, and the § 3553(a) factors distinctly point to the imposition of a federal sentence that runs consecutive to his Maryland sentence.

Many of the pertinent § 3553(a) factors are discussed above, including the seriousness of Smith's offense and his penchant for violent recklessness. It bears reiterating though that Smith's sentence in Maryland is for an entirely separate and unrelated crime that occurred at an entirely different time under entirely different circumstances and in a different jurisdiction. This fact alone calls for a federal sentence to run consecutive to the state sentence.

An alternative result—*i.e.*, ordering that any federal sentence in this case run concurrent to

---

unrelated conduct exists, the sentencing court may impose a sentence "to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense." *See* USSG §5G1.3(d).

[7] A natural reading of the last sentence of § 3584(a) arguably suggests that when two sentences are imposed at different times, they presumptively should be served consecutively. *See* 18 U.S.C. § 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently."); *see also United States v. Williams*, 158 F. Supp. 3d. 1, 3 (D.D.C. 2016) (describing consecutive sentences for two sentences imposed at different times as a "presumptive result."). But the D.C. Circuit has stated that there is no default presumption of consecutive sentences when a sentencing court is exercising its discretion. *Ayers*, 795 F.3d at 173-74.

Smith's state sentence—would fail to account for the seriousness of the offense, would promote disrespect for the rule of law, and would have the opposite effect of deterrence. If individuals knew (or believed) that they could commit a crime in one jurisdiction, then go and commit an entirely different offense in a different jurisdiction, but that the punishment for one of those crimes would effectively be washed away because of the punishment for the other, then they would be *incentivized* to continue breaking the law once their criminality starts.

In addition, as a separate sovereign, the United States has an independent interest in giving independent effect to its sentence. *Cf. Ponzi v. Fessenden*, 258 U.S. 254, 259 (1922) (Discussing comity between the federal and state governments and explaining that, "The people for whose benefit these two systems are maintained are deeply interested that each system shall be effective and unhindered in its vindication of its laws.").

    B.  *The Interstate Agreement on Detainers has no application to this case and cannot serve as a reason to create a* de facto *concurrent sentence.*

The government requested, and the Court issued, a writ of habeas corpus *ad prosequendum* to secure Smith's presence at sentencing. Discussions with Smith's counsel suggest that Smith may try to argue that the Interstate Agreement on Detainers (IAD) mandates that he be held in federal custody until his federal sentence is completed *without* being returned to Maryland to finish serving his state sentence first. The legal basis for this claim is nonexistent. But the practical result of this claim is obvious: if accepted, Smith would effectively get to serve concurrent sentences.

The IAD was passed in 1970 with the laudable goal of "encourage[ing] the expeditious and orderly disposition of [outstanding charges against a prisoner] and all detainers based on untried indictments, informations, or complaints." 18 U.S.C. app. § 2. The law has absolutely no application to this case at this posture—nor does this case and its posture implicate the concerns

animating the IAD.

First, the government has not lodged a detainer against Smith. It only requested and received a writ of habeas corpus *ad prosequendum*. This alone eliminates the application of the IAD and its principles to this case. *See United States v. Mauro*, 436 U.S. 340, 361 (1978) ("a writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the Agreement."); *see also United States v. Codgell*, 585 F.2d 1130, 1136 (D.C. Cir. 1978) (IAD does not apply to writs of habeas corpus *ad prosequendum*) (citing *Mauro*), rev'd on other grounds in *United States v. Bailey*, 444 U.S. 394 (1980); *Kleinbart v. United States*, 426 A.2d 343, 356-57 (D.C. 1981) ("It is settled that a writ of habeas corpus *ad prosequendum* is not a detainer within the meaning of the IAD") (citing *Mauro, Codgell*, and other cases).

Second, though the D.C. Circuit has not opined on the specific issue, the weight of authority has found that a sentencing hearing is generally considered to be outside of the bounds of the IAD. *See, e.g.*, *United States v. Coffman*, 905 F.2d 330 (10th Cir. 1990); *United States v. Currier*, 836 F.2d 11, 16 (1st Cir. 1987) (IAD does not apply "to those who have been convicted but not yet sentenced.") (internal citations omitted). *Cf. Carchman v. Nash*, 473 U.S. 716, 725 (1985) (IAD does not apply to probation violation detainers). It appears the Ninth Circuit is the only circuit to find that the IAD covers detainers lodged for the purposes of a sentencing hearing—but even that finding was dicta predating *Coffman*, *Currier*, and *Carchman*. *See Tinghitella v. State of Cal.*, 718 F.2d 308, 311 (9th Cir. 1983). And, even the Ninth Circuit has not applied the IAD to what happens *after* a sentencing hearing has concluded and a judgment has entered.

Momentarily setting aside that there is no detainer in this case (and therefore, the IAD does not apply), it is easy to see why courts have not applied the IAD to situations where a defendant has been sentenced and resolved his outstanding charges in all relevant jurisdictions. A contrary

approach would render the concept of consecutive sentences for separate crimes in separate jurisdictions a nullity.  But that is the incongruous result the government fears Smith will seek by trying to find a way to get his federal sentence to run concurrent to his unfulfilled Maryland sentence.

## VII.   **CONCLUSION**

For the foregoing reasons, the United States respectfully submits that a 27-month term of imprisonment followed by a three-year term of supervised release, would be sufficient but not greater than necessary to achieve the statutory goals of sentencing.

<div style="margin-left: 40%;">

KRISTEN CLARK
ASSISTANT ATTORNEY GENERAL
CIVIL RIGHTS DIVISION

*/s/ Sanjay Patel*
SANJAY PATEL
Bar No. 6272840 (IL)
Criminal Section – Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street, NE – 7.121
Washington, D.C. 20530
Phone No: (202) 307-6188
Email: Sanjay.Patel@usdoj.gov

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DISTRICT OF COLUMBIA

*/s/ Timothy Visser*
TIMOTHY VISSER
Bar No. 1028375 (DC)
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
Fraud, Public Corruption, and Civil Rights Section
601 D. Street, NW
Washington, D.C.  20530
Phone No: (202) 815-2358
Email: Timothy.Visser@usdoj.gov

</div>